**IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION**

In re: **JANET LAVERN DEDMON, Debtor**                    **No. 4:05-bk-17166**

## MEMORANDUM OPINION AND ORDER

On November 21, 2006, this Court issued its show cause Order [the Order] directing Jo-Ann Goldman [Goldman], the chapter 13 trustee in this proceeding, to show cause why she should not be removed as trustee from this case and all other cases under this title, or otherwise sanctioned, suspended, or disbarred from practicing before this Court. A hearing was held on February 22, 2007. Goldman appeared personally and by her attorney. Nancy Gargula, U.S. Trustee, appeared through Charles W. Tucker, Assistant U.S. Trustee. For the reasons stated below, and pursuant to 11 U.S.C. § 324, Goldman is hereby removed for cause as chapter 13 trustee from this case and all other cases under title 11 in which she is now serving.

## I. Jurisdiction

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157; it is a core proceeding under 28 U.S.C. § 157(b)(2)(A). The Court issued the Order sua sponte pursuant to its authority under § 105 of the bankruptcy code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of title 11 and to take any action or make any determination "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a); *Dinova v. Harris (In re Dinova)*, 212 B.R. 437, 446 n.5 (B.A.P. 2d Cir. 1997) (recognizing in a chapter 7 case that the court can raise issues of trustee misrepresentation and concealment sua sponte to "address a breach of professional ethics, to protect the integrity of the judicial process, or where the interest of justice requires.").

EOD 3/15/07 by
Shari Miller

The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052, made applicable to this proceeding under Federal Rule of Bankruptcy Procedure 9014.

## II. Introduction

Chapter 13 trustees are highly qualified professionals. A court may remove a standing trustee only for cause. 11 U.S.C. §§ 105(a), 324(a). The U.S. Trustee may proceed administratively or judicially to remove a trustee. He or she may commence a statutory action, subject to judicial review. 28 U.S.C. § 586(b),(d)(2); *Richman v. Straley*, 48 F.3d 1139, 1143-44 (10th Cir. 1995). Alternatively, the U.S. Trustee may initiate a removal action under § 324. 11 U.S.C. § 324(a); *see, e.g., In re Drinkwater*, 178 B.R. 590 (Bankr. D. Mass. 1995). In this instance, two of the three Arkansas bankruptcy courts have initiated removal actions against Goldman; the U.S. Trustee has taken no action.[1]

Goldman's removal has its genesis in a chapter 13 case before the Honorable James G. Mixon [Judge Mixon], United States Bankruptcy Court for the Eastern and Western Districts of Arkansas, Pine Bluff Division, *James and Linda Morgan*, Case No. 5:03-bk-12580, and a related adversary proceeding, *James and Linda Morgan v. Jo-Ann Goldman, Chapter 13 Trustee et al.*, No. 5:05-ap-01244 [collectively, the Morgan Case, or, specifically, the Complaint or the Morgan AP]. Goldman, an attorney, was the duly appointed chapter 13 trustee. Judge Mixon made a number of adverse findings directly related to her in that capacity.

It became evident to this Court that Goldman's actions could not be viewed as unique to the Morgan Case; they reflected on her capacity to serve as a chapter 13 trustee in any case, including those before this Court. Goldman's efforts in the Morgan Case were

---

[1] Of the three sitting bankruptcy judges in Arkansas, only the Honorable James G. Mixon and this Court have issued orders to show cause on Goldman. Goldman has no cases pending before the Honorable Audrey R. Evans.

principally designed to shield herself personally from the consequences of her own breach
of an ill-advised agreement entered into in her professional capacity. Mistakes,
unsuccessful argument, or occasional lapses of judgment should not be the basis for
removal of a trustee. However, removal is appropriate when the trustee's reaction to the
disquiet is false testimony (itself a basis for removal), the subject matter of which
illuminated other grounds for removal. This Court has the right, and the duty, to take the
steps necessary to remove Goldman. Her actions in the Morgan Case adequately
demonstrate that her continued service as a chapter 13 trustee is no longer appropriate.

As will be amplified below, there are three bases for this result. First is Goldman's false
testimony; second entails Judge Mixon's specific findings concerning Goldman with
respect to the distribution of tort settlement proceeds; and third is Goldman's reaction to
the possible consequences of her own contractual breach that compromised her
willingness and ability to function properly as a chapter 13 trustee. Although clearly
interrelated, each forms an independent basis for her removal.

### III. Removal for Cause

The chapter 13 trustee is "a creature of the Bankruptcy Code and the Court," *In re
Doherty*, 229 B.R. 461, 464 (Bankr. E.D. Wash. 1999), and the bankruptcy code gives the
chapter 13 trustee a wide range of powers and duties. See, e.g., 11 U.S.C. § 1302, which,
in part, incorporates specific duties enumerated in § 704. The chapter 13 trustee serves as
a representative of the estates to which he or she is appointed and a fiduciary who holds
the debtor's property for the benefit of creditors. 11 U.S.C. § 323(a); *In re Avery*, 272
B.R. 718, 734 (Bankr. E.D. Cal. 2002). As such, the trustee is vested with fiduciary
duties, including, but not limited to, the duties of care, loyalty, and impartiality. *Id.*; *In re
Haugen Constr. Serv.*, 104 B.R. 233, 239 (Bankr. D.N.D. 1989) (discussing the powers
and duties of a chapter 7 trustee under § 704). The trustee is also an officer of the court,
and, as such, owes a primary duty to the administration of justice. *Dinova*, 212 B.R. at
447 (stating that the chapter 7 trustee's filing of a misleading application with the

3

bankruptcy court was a breach of his duty as an attorney and officer of the court). Because of their unique and important position as officers of the court and fiduciaries to the estates in which they serve, these attorneys "owe the court and the public duties of good faith and complete candor in dealing with the judiciary." *Id.*

Several other courts acknowledge an officer of the court's duty to be candid with, and not make any material misrepresentations to, the court. *Bennett v. Williams*, 892 F.2d 822, 823 (9th Cir. 1989) (requiring trustee's candid disclosure to the court to be entitled to quasi-judicial immunity); *Continental Ill. Nat'l Bank & Trust Co. of Chicago v. Charles N. Wooten, Ltd.* (*In re Evangeline Ref. Co.*), 890 F.2d 1312, 1323 (5th Cir. 1989) (stating that filing a fraudulent fee application by an officer of the court was a "flagrant violation of the obligation of candor to the court and fiduciary obligations to the estate."); *Lopez-Stubbe v. Rodriguez-Estrada* (*In re San Juan Hotel*), 847 F.2d 931, 942 (1st Cir. 1988) ("[J]udicial immunity [from personal liability] is contingent upon 'candid disclosure' to the court . . . .").

As attorneys, trustees are also subject to the Rules of Professional Conduct. Rule 8.4 of the Arkansas Rules of Professional Conduct states, in part, that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation" and "engage in conduct that is prejudicial to the administration of justice." Ark. R. Prof. Conduct 8.4(c), (d) (2005). The comments to these rules state that "a pattern of repeated offenses, even ones of minor significance when considered separately, can indicate an indifference to legal obligation." Ark. R. Prof. Conduct 8.4 cmt.[2] (2005).

As officers of the court, fiduciaries to their appointed estates, and attorneys before the court, bankruptcy trustees may be held liable by the court for breach of their duties. The court has a duty to review their performance. *Doherty*, 229 B.R. at 464.

A bankruptcy trustee's violation of a fiduciary duty is a common ground for removal. *In re Waller*, 331 B.R. 489, 493 (Bankr. M.D. Ga. 2005) (addressing, generally, grounds for removal of chapter 13 trustee); *see also Dye v. Brown (In re AFI Holding)*, 355 B.R. 139, 147 (B.A.P. 9th Cir. 2006); *In re Nettles*, 354 B.R. 90, 93 (Bankr. D.S.C. 2006) (discussing removal for cause); *Michel v. Fisher (In re Lake States Commodities)*, 185 B.R. 259, 264 (Bankr. N.D. Ill. 1995) (same).

Section 324 of the United States Bankruptcy Code governs the removal of trustees by the court. Under § 324(a), a court may remove a chapter 13 trustee "for cause" after notice and a hearing.[2] "Cause" is not specifically defined by the bankruptcy code. However, "[t]he court has broad power to remove a trustee" for cause. *Lake States Commodities*, 185 B.R. at 264 (citing Robert E. Ginsburg and Robert D. Martin, *Bankruptcy: Text, Statutes, Rules* § 4.01[f] at 4-18 (1992)). The removal of a trustee under § 324 "requires more than unsupported inferences but rather a strong showing of cause." *Nettles*, 354 B.R. at 93; *Alexander v. Jensen-Carter (In re Alexander)*, 289 B.R. 711, 714 (B.A.P. 8th Cir. 2003) (stating that a conclusory contention unsupported by facts is not sufficient grounds to remove a trustee).

Some courts have held that removal is proper where the estate will "'suffer more from the discord created by the present trustee than would be suffered from a change in administration . . . .'" *AFI Holding*, 355 B.R. at 149 (quoting *Baker v. Seeber (In re Baker)*, 38 B.R. 705, 708 (D. Md. 1983)); *Lake States Commodities*, 185 B.R. at 264 (stating that "[e]ven an honest trustee may be removed if he or she loses so much of the creditors' confidence that discord threatens the estate.").

---

[2]   The purpose of § 324 is to enable a court to remove a trustee who is "functioning improperly, poorly or even illegally in cases" quickly from all cases in which he or she serves in just one hearing. H.R. Rep. 764 at 27, 99th Cong. 2 (Aug. 7, 1986).

5

While the standard for removal of a trustee for breach of fiduciary duties in the Eighth Circuit has not been formalized, other courts have held that a "totality of the circumstances" standard should be applied, that courts should evaluate each case on a case by case basis, and that what constitutes sufficient cause for removal of a trustee is left to the sound discretion of the bankruptcy court. *See, e.g., AFI Holding*, 355 B.R. at 152 (removal of chapter 7 panel trustee); *Haugen Constr. Serv.*, 104 B.R. at 240 (discussing removal under § 324(a) generally).

## IV.  The Morgan AP

In spring 2005, James and Linda Morgan [the Morgans] sought and obtained bankruptcy court approval of the settlement of a tort claim they had against a third party. (Ct. Ex. 2, Ans. Compl. Turnover, ¶¶ 9-11.)  After payment of attorney's fees and costs, the settlement generated net proceeds in the sum of $30,056.03. (Ct. Ex. 2 ¶ 12.)  Goldman's office received this amount on May 10, 2005. (Ct. Ex. 2 ¶ 12.)  On May 18, 2005, Goldman "refunded the sum of $10,000 to the Debtors pursuant to the Debtors' request of funds received by the Trustee on May 9, 2005." (Ct. Ex. 2 ¶ 13.)  On June 1, 2005, Goldman's office distributed the $20,056.03 balance [sometimes, the $20,000.00 amount] to the Morgans' unsecured creditors pursuant to the Morgans' confirmed chapter 13 plan.[3] (Ct. Ex. 2 ¶ 14.)

On August 30, 2005, the Morgans filed a Complaint for Turnover [the Complaint, or, generally, the Morgan AP] against Goldman, as chapter 13 trustee, and a number of their unsecured creditors.  The Morgans' Complaint had unintended consequences to the detriment of both the Morgans and Goldman.

The gravamen of the Morgans' Complaint was that Goldman improperly disbursed the $20,000.00 amount to their unsecured creditors contrary to (1) the Morgans' confirmed

---

[3]   The Complaint for Turnover suggests this amount was actually $19,150.37. (Ct. Ex. 1 ¶ 3.)  The discrepancy is unexplained and irrelevant to this opinion.

chapter 13 plan and/or (2) an express agreement with Goldman that she would distribute the entire amount to the Morgans' principal secured creditor. (Ct. Ex. 1, Compl. Turnover, ¶¶ 3-6; Ct. Ex. 3, Tr. Adversary Proc. Compl. Turnover, at 7-9.) It is solely the second argument that is pertinent to this Court's opinion. The Morgans contended that the unsecured creditors should not have received disbursements prior to secured creditors "pursuant to correspondence between Plaintiffs' counsel and Jo-Ann L. Goldman, Chapter 13 Trustee . . . ." (Ct. Ex. 1 ¶ 4.) Goldman's Answer to Complaint for Turnover specifically denied these allegations. (Ct. Ex. 2 ¶¶ 1-2.)

Judge Mixon heard the Complaint on May 10, 2006. Goldman appeared personally and was represented by counsel. As stated previously, this proceeding generated unintended consequences.

First, Judge Mixon began to inquire about the tort settlement distributions to both the unsecured creditors and the Morgans. Subsequently, Judge Mixon made specific findings and conclusions concerning the distributions that form a basis for Goldman's removal. (Ct. Exs. 10, 11, 15, 16, 17.) These findings will be discussed in greater detail below.

Second, Goldman testified at the May 10, 2006, hearing. (Ct. Ex. 3.) Her testimony at this hearing, when contrasted with that in a later hearing, is pertinent to the conclusion that Goldman's testimony at the subsequent hearing was false.

On June 22, 2006, Judge Mixon issued an Order to Show Cause in the Morgan Case why the Morgans, as well as Goldman, should not be required to reimburse the estate the $10,000.00 distribution. (Ct. Ex. 13, Or. to Show Cause.) The court also sought an accounting of these funds. (Ct. Ex. 13.) Judge Mixon's order to show cause was heard on July 5, 2006, and resulted in his Order (later Amended Order) and separate Memorandum Opinion dated October 3, 2006. Neither ruling was favorable to the Morgans or Goldman. (Ct. Exs. 15, 16, 17.)

Consequently, the Morgans filed their Plaintiffs' Motion to Amend Judgment or for New Trial. (Ct. Ex. 7, Pls.' Mot. Amend J. New Trial.)  Judge Mixon heard this motion on November 7, 2006.  (Ct. Ex. 9, Tr. Hrg. Mot. Stay Pending App. Bond and Mot. Amend Modify J. and New Trial.)  On November 20, 2006, he entered an order denying the motion.  (Ct. Ex. 10, Or.)  Additionally, the order contained a finding that Goldman had given false testimony at the November 7 hearing.  (Ct. Ex. 10 at n.1.)

As a result, Judge Mixon promptly entered an order to show cause why Goldman should not be removed as trustee pursuant to 11 U.S.C. § 324 on the basis of "false testimony under oath . . . ." (Ct. Ex. 11, Or.)  A hearing was held on January 19, 2007, before Judge Mixon; he has not ruled as of the date of this opinion.  (Ct. Ex. 12, Tr. Hrg. Ct.'s Or. to Appear and Show Cause.)  The serious nature of these findings dictated that this Court issue its own show cause Order on November 21, 2006, which was heard on February 22, 2007.

## V.  False Testimony and Lack of Candor
### A.  May 10, 2006 Hearing

The false testimony issue relates specifically to the distribution of the $20,000.00 amount. Stated succinctly, it is apparent from a review of the May 10 hearing transcript that Goldman both admitted and had, in fact, reached an agreement with Jeremy Bueker [Bueker], counsel for the Morgans, that she would distribute the funds directly to the Morgans' principal secured creditor--DeWitt Bank and Trust, the holder of the mortgage on the Morgans' home.  (Ct. Ex. 3.)  This was apparent from her testimony and a series of supporting emails between Goldman and Bueker.[4]  (Ct. Ex. 9.)  Confounding the matter is that Goldman breached the agreement and allowed her office instead to distribute the

---

[4]  The testimony reflects that perhaps some of the money was to go to priority creditors prior to the secured creditor.  However, this is not particularly relevant to the agreement, which can be reduced to simply an agreement to pay the secured creditor before the unsecured creditors.

money to the unsecured creditors.  She did so inadvertently through administrative error or oversight by failing to make a notation in the file.  (Ct. Ex. 3 at 50-51.)

A series of emails (concerning the form of the order approving the tort settlement) supported the Morgans' contention that an agreement existed.  The final exchange states as follows:

> Bueker to Goldman:
>
>> My intention was to be certain that secured and priority creditors are paid in full before money is disbursed to unsecured creditors and to make certain that debtors can request a refund.  If the base needs to be raised to accomplish this, that is fine.  What language do you suggest that I use to make sure that is how money is disbursed?  Mr. and Mrs. Morgan understand that their payments to the Trustee's office are to continue.
>
> Goldman to Bueker:
>
>> The problem is that is not how extra disposable income is supposed to work--that money is for unsecured creditors--I can do that, but the base will have to be raised.  Just state the money is coming to my office period.  We put the money on hold for 30 days for the debtor to request the refund.
>
> Bueker to Goldman:
>
>> If I state that the money comes to your office period, will you first pay off secured and then priority claims before money is disbursed to unsecured creditors?  If not, I think the debtors are better off dismissing or converting to Chapter 7.  I advised them to proceed this way so that their house would be paid off.
>
> Goldman to Bueker:
>
>> I will pay it out but add whatever the amount is to the base, so the unsecured creditors are being paid with the monthly payments.
>
> Bueker to Goldman:
>
>> Attached is the revised Order.

(Ct. Ex. 11, email attachment.)

However, Goldman neglected to make a notation of her agreement in the file, and the $20,000.00 amount was instead distributed to the unsecured creditors.  This generated the

9

Morgan AP against Goldman and the unsecured creditors who benefited from the unintended distribution.

Despite having an agreement with Bueker, Goldman, at the May 10 hearing, initially took the position that the distribution to the unsecured creditors was proper. (Ct. Ex. 3 at 10-12.) Consistent with that position, Goldman's attorney elicited from Goldman the following testimony:

> Q:     Let me ask you though, in the e-mails that went back and forth between yourself and Mr. Bueker, when you stated to Mr. Bueker that you supposed that you could pay secured creditors with the proceeds, did you in fact intend to pay secured creditors with the proceeds?
>
> A:     Well, Mr. Bueker and I had conversations other than the e-mail. We actually did have a telephone conversation, and that telephone conversation entailed, "Why does it matter if the debtor wants to continue to pay the 775 a month anyway? The same money is going to go to unsecured creditors, so why does it matter?"
>
> When I get a request like this, it would be a courteous request that I would grant a request like this because it's not being done in the ordinary course of my business, which means it has to become now a manual process for my staff.
>
> So it would have been out of courtesy. But with my conversation with Mr. Bueker the result would have been the same because had the unsecured creditors not gotten the benefit of the 20,000 when I paid it out, they would have gotten the 775 a month, and they would have gotten--they would have gotten that money anyway.
>
> So if the debtor didn't intend on changing the plan terms, or doing anything else during the course of the plan, then the net result would have been the same, which would have been the only reason why I would have told Mr. Bueker I could do that.

(Ct. Ex. 3 at 43-44.)

In turn, the Morgans' counsel pressed Goldman on her equivocal testimony:

> Q: Okay. But you agree that the e-mail is very clear as-
>
> A: Yes.

> Q: -that you would disburse the money to the secureds first?
>
> A: Yes.

(Ct. Ex. 3 at 45.)

Also:

> Q: Okay.  So under that analysis, when you drop the money in it should have paid administrative, then paid off DeWitt Bank and Trust which is secured, and any money left over would continue to filter down to the-
>
> A: Of the regular monthly payment, that's correct.  And that's what happened.
>
> Q: But your e-mail with Mr. Bueker was that you would pay it to secured?
>
> A: As a professional courtesy, and with the meeting of the minds that the debtor intended on staying in 58 months, I was willing to grant his request.
>
> Q: Okay.  But then it didn't happen?
>
> A: Unfortunately, I didn't docket that in the docket.
>
> Q: Okay.
>
> A: And my staff, it disbursed as it normally would pursuant to office procedure.
>
> Q: Okay.

(Ct. Ex. 3 at 50-51.)

In fact, the emails reflect that Morgans' counsel concurred that the amount paid to the secured creditor would be added to the base and thus replenished with future monthly plan payments.  (Ct. Ex. 11, email attachment; Ct. Ex. 3 at 21:21-25 (where Bueker, under oath and with reference to the email exchange, stated: "When I finally got that response I took it to mean that she would collect the money, she would pay the secureds in full, any left over would go to the unsecureds.  Mr. and Mrs. Morgan would stay in

Chapter 13 and their $775.00 a month payment would go to unsecured creditors."); *see also* Ct. Ex. 16, Mem. Op., at 4-5.)

Judge Mixon sought clarification of Goldman's sometimes evasive and equivocal testimony regarding the agreement:

> THE COURT: Okay. So what happened here is you agreed to, with Mr. Bueker, if he would give you the money you would disburse it to the secured creditor and then you didn't make that proper note or something in the docket, and the money went out contrary to your agreement?
>
> THE WITNESS: Well, realize though this wasn't to get the money.
>
> THE COURT: Okay. I understand.
>
> THE WITNESS: I knew I was going to get the money.
>
> THE COURT: That's right.
>
> THE WITNESS: So it was just under the terms we don't want that to be a restrictive order telling the Trustee how to disburse, so we always request that it come in and it be disbursed pursuant to the confirmed plan.
>
> And had these e-mails not been exchanged or I had docketed it correctly I was--that would have been a professional courtesy to do that for him because the net result would have been the same, would have been the only reason why. I rarely ever by e-mail agree to do that.
>
> THE COURT: And the answer to my question is, "Yes," then that's what happened?
>
> THE WITNESS: Yes. Yes, that's what happened.
>
> THE COURT: All right. Okay. And then you agreed to that under the assumption that he would continue to pay the plan over the balance of the 58 months?
>
> THE WITNESS: That's right.
>
> THE COURT: Was that ever expressly agreed to between you and Mr. Bueker-

THE WITNESS: Well-

THE COURT: -as a quid pro quo that you would agree to do this if he would stay for 58 months?

THE WITNESS: We were having a banter back and forth, and in particular I remember a telephone conversation where I said, "Why does it matter if the unsecured"--

THE COURT: No, no.  Listen to my question.  Was that specifically agreed to that you would pay the secured claims with that money if he would stay in for 58 months?

THE WITNESS: No.

COURT: There was no specific?

THE WITNESS: No.

THE COURT: It was just discussed?

THE WITNESS: No.  It was just discussed.

THE COURT: Okay.  And you sort of assumed that he would do that?

THE WITNESS: I sort of assumed and hoped that he would-

THE COURT: Okay.

(Ct. Ex. 3 at 54-56.)

Unquestionably, Goldman verbally and through her emails agreed with the Morgans' counsel that she would distribute the funds in question to their principal secured creditor. She assumed the Morgans would remain in their chapter 13 proceeding long enough to replenish the funds on hand for the long-term benefit of the unsecured creditors.  In fact, Bueker shared that assumption.  However, Goldman failed to incorporate or memorialize that assumption in her agreement.  Nevertheless, an agreement was made.  By administrative oversight, she breached the agreement.  For that, the Morgans sued her.

## B. July 5, 2006 Hearing

At the conclusion of the May 10 hearing, Judge Mixon took the case under advisement.
(Ct. Ex. 3 at 60.)  Before he could rule, Goldman sought to settle the Morgan AP.  An
agreement was reached and presented to Judge Mixon.  (Ct. Ex. 4.)

The settlement represented Goldman's complete capitulation.  The one paragraph
Settlement of Debtors' Complaint for Turnover [the Settlement] provided as follows:

> 1. The complaint for turnover of funds is hereby withdrawn on condition
> the Trustee will recover from the disbursement made to unsecured
> creditors sums sufficient to pay the remaining balance due the secured
> claimant, DeWitt Bank and Trust, and attorney fees to debtors' counsel in
> the sum of $1,500.00.

(Ct. Ex. 4.)

Goldman and the Morgans' attorney were the only two signators to the Settlement.  The
one page, one paragraph Settlement agreement references Goldman and the Morgans as
the only parties to the agreement.  The other defendants, the unsecured creditors who
benefited from Goldman's breach of the agreement, were not signators.  They were
noticed of the Settlement.

Judge Mixon scheduled the Settlement for hearing on July 5, 2006.  (Ct. Ex. 5.)  At the
hearing, Judge Mixon's prefatory remarks reflect his recollection from the May 10
hearing that Goldman had reached an agreement with the Morgans' attorney.  (Ct. Ex. 6,
Tr. Oral Ruling Stipulated Settle. and Hrg. Ct.'s Or. to Show Cause, at 5-6; Ct. Ex. 6 at
17:16-18 (where Judge Mixon stated "And she has acknowledged that she made the
agreement and that it was an inadvertent error that it got paid to the unsecureds.").)

At the hearing, Goldman was represented by Linda McCormack [McCormack], an
attorney in Goldman's office.  McCormack's statements on the record correctly reflect
that, in fact, an agreement had been reached; McCormack sought to focus the problem on
the failure to memorialize or incorporate into the agreement any provision that the

14

Morgans would not later modify their plan with respect to the unsecured creditors. The Morgans had subsequently modified their plan to stop the monthly payments after the 36th month (in lieu of the full 58 months, which would have replenished the base for the benefit of the unsecured creditors had Goldman complied with the agreement and distributed the $20,000.00 amount to the secured creditor). However, this modification (filed in March, confirmed in April 2006, (Ct. Ex. 16 at 7)) occurred after Goldman breached her part of the agreement (in May/June 2005, (Ct. Ex. 2 ¶14), although McCormack suggested an incorrect October 2005 distribution date at the hearing) by distributing the $20,000.00 amount to the unsecureds. (Ct. Ex. 6 at 5-6, 11.)

McCormack was clear in her understanding that Goldman had reached an agreement with the Morgans' attorney. In pertinent part, McCormack made the following statement:

> MS. McCORMACK: No, your Honor, I do not. And that presupposed the problem with the beginning of this case when the funds were paid in. And even though there was an agreement that was made between Ms. Goldman's office and Mr. Bueker it presupposed some other conditions that did not happen.
>
> The problem that we are having is, is because that money was disbursed-- the funds that were disbursed from the settlement were disbursed in October of 2005. And then that modification, the last modification that proposed to pay zero percent to unsecureds, was filed after that disbursement.
>
> So there is a problem with noticing the unsecured creditors. Because they had been paid they would have had no reason to object to a zero percent dividend at that point because the money had been disbursed. They had no idea that, you know, an adversary complaint was going to be filed to recover that.
>
> And in the agreement that was made with Mr. Bueker to disburse the funds a certain way, when in fact they weren't, that presupposed some other conditions as well in that the debtor essentially agreed, not per se in the e-mails that were exchanged between the offices, but there was no indication--and that was Ms. Goldman's fear with disbursing the money any differently than how she wanted to disburse it, was is that is exactly what would happen is that the debtor's funds would be disbursed to secured creditors and then later on somewhere down the line they would

15

> propose no dividend to unsecureds, and then that money is gone and there
> is no way to recoup it at that point.

(Ct. Ex. 6 at 11-12.)

Ms. McCormack stated further:

> But her policy was to disburse it the way she wanted to, but out of a
> professional courtesy to their office she did agree to a different
> disbursement, against probably her better judgment, and presupposed
> some other conditions that now have not happened.

(Ct. Ex. 6 at 13:15-19.)

Through Goldman's emails, her own testimony, and her counsel's statements in the
record, it is clear Goldman reached an agreement with the Morgans' attorney. Only after
Goldman's breach did the Morgans modify their plan.

### C. Memorandum Opinion

As indicated above, the Morgan AP was heard on May 10, 2006. At the conclusion of the
hearing, Judge Mixon took the matter under advisement. Prior to Judge Mixon ruling,
Goldman and the Morgans attempted to settle the Morgan AP. This settlement effort was
rejected by Judge Mixon at the conclusion of the July 5, 2006, hearing. (Ct. Ex. 6 at
41:17.)

Additionally, following the initial May 10 hearing, Judge Mixon entered a separate Order
to Show Cause on June 22, 2006, wherein sua sponte he ordered the Morgans and
Goldman to appear on the same day, July 5, 2006, and show cause why they should not
be required to either jointly or individually reimburse the estate the sum of $10,000.00.
(Ct. Ex. 13.) This $10,000.00 amount is separate from the approximately $20,000.00
amount that was the subject of the agreement between the Morgans' counsel and
Goldman concerning distribution to the principal secured creditor.[5] (Ct. Ex. 13.)

---

[5]   Judge Mixon also entered an Order to File Amended Accounting related to the
$10,000.00 sum. (Ct. Ex. 14, Or. File Amend. Acctg.)

At the conclusion of the July 5, 2006, hearing, Judge Mixon took the matter under advisement. (Ct. Ex. 6.)  On October 3, 2006, he issued both a Memorandum Opinion, (Ct. Ex. 16), and separate Order, (Ct. Ex. 15, Or.), which order was amended by his separate Amended Order, (Ct. Ex. 17, Amend. Or.), entered October 10, 2006.  The Amended Order will be discussed in greater detail below.  However, it is significant to note at this point that the Amended Order ordered Goldman to reimburse the estate the $10,000.00 amount.

In his Memorandum Opinion, Judge Mixon disapproved the Settlement proposed by Goldman and the Morgans and dismissed the Morgans' Complaint.  Pertinent to the false testimony issue, an examination of Judge Mixon's Memorandum Opinion reflects clearly that Goldman had, in fact, reached an agreement with the Morgans' counsel. Significantly, Judge Mixon found as follows:

> Bueker understood that the Trustee agreed to distribute the proceeds to pay the claim secured by the Debtors' home and that the Debtors would continue in the case for the full 58 months, and, therefore, unsecured creditors would receive much of the $775.00 per month payment over the life of the plan.
>
> . . . .
>
> Contrary to the understanding between the Trustee and Bueker, the Trustee's office distributed approximately $20,000.00 to unsecured creditors shortly after receipt of the tort settlement.  The Trustee testified she forgot to inform her staff of her agreement with Bueker, and the money was paid pursuant to established procedures.  As a result, the Debtors filed this adversary proceeding seeking to recover the funds from the Trustee and the creditors.

(Ct. Ex. 16 at 4, 5 (footnote omitted).)

Additionally:

> The Trustee admitted that she agreed with Bueker to pay the proceeds of the tort settlement to the bank as a courtesy even though she interpreted the plan as requiring her to pay the settlement proceeds to unsecured creditors.  She said she agreed to do that, hoping the Debtors would not

>file a modification after 36 months to discontinue any payments to
>unsecured creditors.  Of course, this is exactly what the Debtors did.

(Ct. Ex. 16 at 11.)

Further, and reflective of the Morgans' reaction after the distribution contrary to their

agreement with Goldman:

>To compound the issues raised in the case, the Debtors filed a third
>modified plan on March 16, 2006, while this adversary proceeding was
>pending and after the case had been pending for 36 months.  The third
>modified plan proposed no further distribution to unsecured creditors in
>the case.  Neither the Trustee nor any creditor objected to confirmation;
>therefore, the modified plan was confirmed on April 11, 2006.

(Ct. Ex. 16 at 7 (footnote omitted).)

Goldman should have objected to the third modified plan, which was clearly contrary to

her supposition and expectation that the Morgans would stay in their plan and replenish

their payment base.  Goldman failed to do so, as noted by Judge Mixon in a footnote in

his Memorandum Opinion:

>The Trustee admitted she should have objected to the third modification.
>When questioned by the Court, she stated,
>
>>The Court:     And you were in a position to object to his
>>modification if he didn't do that, I assume?
>>
>>The Witness:  I was.  Those modifications come through routinely
>>in my office with 9,000 cases, and obviously, we didn't object to
>>this modification in March when it came in paying zero percent.
>>
>>The Court:     You would have if you had noticed it?
>>
>>The Witness:  Yeah, we should have.
>
>(Tr. 56)

(Ct. Ex. 16 at 7 n.3.)

Here, Goldman's testimony is disingenuous.  Goldman admitted that she should have

objected to the modified plan.  However, to effectively do so she would have had to

18

acknowledge her agreement and assert that it required the Morgans to continue paying
into their plan for 58 months.  It would have been difficult for Goldman to take that
position given that she had already breached the agreement by distributing the tort
settlement proceeds to the unsecured creditors as opposed to the secured creditor.  At the
time the Morgans filed their modified plan, her breach was already the subject of the
Morgan AP, which sought to enforce the agreement and recoup the distribution to the
unsecured creditors.  Accordingly, Goldman should have objected and preserved the
unsecured creditors' rights, which rights she had directly compromised.  Goldman's
unwillingness to deal with the consequences of her own breach froze her ability to
properly perform her trustee duties.

### D.  November 7, 2006 Hearing

Following the issuance of Judge Mixon's unfavorable Memorandum Opinion and
Amended Order in October 2006, the Morgans filed their Plaintiffs' Motion to Amend
Judgment or for New Trial [the Motion].  (Ct. Ex. 7.)  The Motion was set for hearing on
November 7, 2006.  (Ct. Ex. 8, hearing notice.)

At the November 7 Motion hearing, and with apparent disregard for Judge Mixon's
findings, her attorney's admissions, and her own testimony, Goldman changed her
testimony.  Goldman testified in response to questions posed by the Morgans' attorney as
follows:

> Q: Wouldn't you know if you've just--well, special circumstances.  Has
> there been an occasion where you've agreed to pay administrative,
> secured, ahead of unsecured?
>
> A: I don't agree.  I interpret a plan and I disburse pursuant to a confirmed
> plan.
>
> Q: Okay.
>
> A: Or other orders of the Court.
>
> Q: Isn't it true that you agreed, in this case, to disburse the money first to

19

administrative, secured, and then to unsecured lastly?

A: No.

Q: Are you aware of the e-mail that's been introduced in this matter?

A: Yes.  But I e-mail attorneys everyday, and we talk about and banter about cases all the time.

(Ct. Ex. 9 at 23:9-23.)

Judge Mixon followed up and inquired of Goldman:

THE COURT: Okay.  But now, do I understand your testimony to be that you deny that you had an--that you made an agreement with Mr. Bueker that you would distribute that 20,000 to the secured claim at the Bank of DeWitt?

THE WITNESS: That's correct.

THE COURT: Did you--

THE WITNESS: I have e-mail and phone conversations with attorneys everyday about how the plans are interpreted.  And without a modification of the plan, I would disburse the money as the plan is interpreted.

THE COURT: You don't recall those e-mails where you--where they purport to show that you agreed to do that?

THE WITNESS: Yes, I recall the e-mails.  I had numerous phone conversations with him and numerous e-mails about how the money would be disbursed.  And I explained to Mr. Bueker on numerous occasions, and I testified to this in the original hearing, and that was that's not the way I read the plan, that's not the way my office regularly disburses the money.

I suppose that if what he's saying is true, it could be interpreted that way.  But if he was arguing to me, it wouldn't make a difference because the unsecured creditors would get the benefit of the money.

The end result of my last conversation was: "Then why do you care?  What's the difference?"

20

But none of that--I do not send e-mails and modify plans by virtue of e-mails. I can't do that. I have no power to do that.

The only thing I can modify a plan, is a modification of the plan.

THE COURT: So you deny his allegation that you agreed to pay the 20,000?

THE WITNESS: Yes.

THE COURT: With him?

THE WITNESS: Yes.

THE COURT: Okay.

(Ct. Ex. 9 at 26-28.)

Clearly, Goldman's responses contradict her earlier sworn testimony. Apparently, now cognizant of Judge Mixon's unfavorable rulings (discussed in greater detail below), she sought to distance herself from her own admissions concerning her handling of the tort settlement proceeds.

On November 20, 2006, Judge Mixon entered his order denying the relief sought by the Morgans in their Motion. In a footnote, Judge Mixon referenced Goldman's testimony:

A new and disturbing issue did arise at the hearing on the motion for a new trial. The Trustee, Jo-Ann Goldman, testified under oath that she never made an agreement with Debtors' counsel that she would cause the approximately $20,000.00 to be paid to the Debtor's secured creditor. She repeated the testimony several times at the hearing despite her previous testimony at the hearing held May 10, 2006, in which she admitted that she had made such an agreement. This testimony was corroborated by the Debtor and counsel for the Debtor. The Court finds Ms. Goldman's testimony that she had no agreement to pay the Debtor's secured claim is false.

(Ct. Ex. 10 n.1.)

On December 10, 2006, Judge Mixon entered a second order concerning the false testimony issue. More specifically, Judge Mixon entered an order to show cause why

21

Goldman should not be removed as trustee in all cases then assigned to her. The order contained the following:

> Specifically, Jo-Ann Goldman testified that she had no agreement with counsel for the Debtors to distribute the sum of $19,150.37 to the Dewitt Bank & Trust Company from the proceeds of a post-petition settlement of a tort claim when, in truth and fact, she had made such an agreement, which she acknowledged in previous testimony. Her previous testimony was also corroborated by e-mails, the Debtors' testimony and testimony of the Debtors' counsel, Jeremy Bueker.

(Ct. Ex. 11.)

A hearing on this order was scheduled for January 19, 2007.

### E. January 19, 2007 Hearing

On January 19, 2007, Judge Mixon convened a hearing on his order to show cause why Goldman should not be removed as a trustee. At the conclusion of the hearing, Judge Mixon took the matter under advisement. Judge Mixon has not ruled as of the date of this Court's opinion.

### F. February 22, 2007 Hearing

This Court held a hearing on its show cause removal Order on February 22, 2007. Goldman appeared personally and through counsel. At the request of Goldman's counsel, the transcript of Judge Mixon's January 19, 2007, hearing was incorporated into the record at this Court's February 22, 2007, hearing. (Ct. Ex. 12; Goldman Ex. 1.) Goldman did not testify at the February 22 hearing.

Goldman's January 19 testimony represents a tortured effort to reconcile her previous testimony. Stated succinctly, Goldman's new position is that, as her counsel termed it, there "was no final unconditional agreement on the distribution of the tort settlement proceeds." (Ct. Ex. 12 at 8:18-20.) Goldman's contention is that because she and the Morgans' counsel never reached an agreement that the debtors would stay in their chapter 13 proceeding for 58 months (to replenish the money that should have been distributed to

22

the secured creditor), no agreement ever existed.  (Ct. Ex. 12 at 11-14.)  This argument
fails on several counts.

First, it is simply not what Goldman testified to at the May 10 hearing, and what
McCormack, her attorney, confirmed and admitted at the July 5 hearing.  Second, and
more specifically, at the May 10 hearing Goldman finally admitted, after a persistent
effort by Judge Mixon, that she had failed to include the 58 month provision in her
agreement with Bueker.  (Ct. Ex. 3 at 54-56.)  That just means the agreement was not as
comprehensive as she would have wished and should have negotiated; it does not mean
an agreement did not exist.[6]  Goldman failed to include the assumption or condition in the
agreement.  Even if included in the agreement, the condition (continued payment
performance in the plan) could only be performed post-distribution to the secured
creditor, meaning that the agreement is not conditional but simply one subject to breach
by the Morgans.

Third, and despite her assertion that no agreement existed, both Goldman and her
attorneys have acknowledged that the money was sent to the unsecured creditors because
Goldman neglected to make a notation in the file,[7] which notation would have been
unnecessary if there were no agreement.  Her January 19 explanation to Judge Mixon that

_____

[6]   Despite all this, Bueker, in actuality, was in agreement with the Morgans' paying into
their chapter 13 plan for 58 months to replenish the base.  (Ct. Ex. 3 at 21-22.)  The
Morgans filed a third modified plan providing for a 36 month payment only after
Goldman made the distribution contrary to their agreement.

[7]      As the Court knows, Ms. Goldman did not place a notation of her
discussions with Mr. Bueker in the file, and the tort settlement proceeds
were distributed pro rata to the unsecured creditors.  This was done in
error.  There's no getting around it.  And it was--it was Ms. Goldman's
fault.
(Ct. Ex. 12 at 16, opening statement of Goldman's counsel, and 44, Goldman's
testimony; *see also* Ct. Ex. 3, at 50-51, 54-55; Ct. Ex. 6 at 17.)

a notation would have been necessary to reflect that she was in negotiations simply is not supported by her previous testimony.

Fourth, and simply stated, Goldman's testimony at the January 19 hearing, incorporated into the record at this Court's February 22 hearing, lacks credibility. She continues to demonstrate a lack of candor with the court. It is clear she made an agreement with Bueker. She neglected to alert her office of the agreement; in turn, her office distributed the money to the unsecured creditors instead of the secured creditor. Once the agreement, poorly negotiated by Goldman, came to light in the original May 10, 2006, hearing, Goldman attempted to settle the Morgan AP. The proposed settlement (rejected by Judge Mixon) represented a complete capitulation at the expense of the unsecured creditors, an inexplicable concession if, in fact, no agreement ever existed. At the July 5 hearing on the settlement, her attorney admitted that Goldman had made the agreement, albeit poorly, and perhaps "against probably her better judgment . . . ." (Ct. Ex. 6 at 13:17-18.)

Thereafter, Goldman significantly compounded her earlier errors by then choosing at the November 7, 2006, hearing to alter her testimony in a manner she presumably thought in her best interest given Judge Mixon's Memorandum Opinion and Amended Order. This Court concurs with Judge Mixon; Goldman gave false testimony at the November 7 hearing.

## VI. Breach of Fiduciary Duty

Additional independent grounds exist justifying Goldman's removal. Equally important as her false testimony are other findings by Judge Mixon in the context of the Morgan AP. Concerning the $20,000.00 distribution, Judge Mixon's Memorandum Opinion contains the following statement:

> Instead of filing a modified plan to deal with the changed circumstances pursuant to section 1329, the Debtors' counsel and the Trustee arrived at an agreement that was not disclosed to either the Court or other parties in interest who might have objected. This secret agreement for distribution under the existing plan was admittedly contrary to what the Trustee

24

> thought was a proper distribution.  In the Court's opinion, if the Trustee
> had performed as she agreed, she would have been guilty of malfeasance.
> She said she did this as a favor to Debtors' counsel.  The fact that the
> agreement was undisclosed does not reflect favorably on either the Trustee
> or Bueker.
>
> The Debtors' final argument is that an injustice has occurred because the
> Chapter 13 Trustee breached her agreement with counsel for the Debtors
> to pay the bank's secured claim.  The Trustee does not dispute this and
> admits that she was at fault for not notifying her staff of the agreement.

(Ct. Ex. 16 at 13.)

That Goldman subsequently testified falsely with respect to the agreement should not

obscure the fact that she made an inappropriate and unauthorized agreement in the first

place.  Specifically, and as stated by Judge Mixon, she reached an agreement that (1) was

contrary to her understanding of the confirmed plan and (2) was not disclosed to the court

or other parties in interest with, as is normally contemplated by a modified plan, a

commensurate opportunity for objection.  She compounded those errors with her lack of

candor and false testimony.

As has been previously stated, all of this came about as a result of approximately

$30,000.00 realized by the Morgans in the context of a tort claim settlement.

Approximately $20,000.00 was the subject of the agreement that precipitated the Morgan

AP.  While considering that issue, Judge Mixon initiated an investigation of the

$10,000.00 "refund."  Judge Mixon elicited testimony concerning this amount at the May

10, 2006, and July 5, 2006, hearings.

This $10,000.00 amount was the subject of Judge Mixon's October 3, 2006, Order, (Ct.

Ex. 15), later his Amended Order issued October 10, 2006, (Ct. Ex. 17).   In his show

cause order issued in furtherance of this examination, Judge Mixon noted that this

amount was distributed by Goldman to the Morgans,

> without a court order, a motion being filed, or notice to the creditors.  The
> sum was not authorized to be disbursed to the Debtors either by the terms

25

> of a confirmed plan or by the provisions of the United States Bankruptcy
> Code, said sum constituting disposable income required to be distributed
> to unsecured creditors pursuant to the confirmed plan and the United
> States Bankruptcy Code.

(Ct. Ex. 13.)

The Morgans initially requested a refund in the amount of $9094.17 from the tort
settlement proceeds. The Morgans, personally and through Bueker, represented that the
money was necessary for a new roof, roof installation, and vehicle repairs.

The Morgans never amended their Schedule J to reflect the alleged additional expenses,
or their Schedule I to reflect the additional income. Alternatively, although the tort claim
was listed on their Schedule B as personal property, that schedule was not amended and
Goldman's office apparently performed no analysis under § 1306. No notice was given to
creditors of this actual distribution directly to the Morgans.[8]

The Morgans used the $10,000.00 refund for gambling adventures in Mississippi and
Nevada, to pay off post-petition credit card debts, and attend a family reunion in Paris,
Texas. The Morgans also used part of the money to make at least one of their regularly
scheduled plan payments.

In his Amended Order, Judge Mixon ordered the Morgans to reimburse Goldman as the
chapter 13 trustee and indicated that the Morgans would be referred to the U.S. Attorney
for possible criminal sanctions. In addition, Judge Mixon made specific findings
concerning Goldman:

> The entire system is corrupted when the debtor's proposed distribution is
> negotiated in private consultations between the debtor's counsel and the

---

[8]   As the Morgans were not obligated to repay the distribution, it did not fall within the
purview of plan language arguably related to refunds designed to assist debtors in
temporary dire straits. That chapter 13 procedure, not under scrutiny here, contemplates
that the debtors will replenish the base fund amount. See further discussion in note 9.

> Chapter 13 Trustee and accomplished without affording creditors notice
> and opportunity to object.

(Ct. Ex. 17 at 8.)

Further, Judge Mixon concluded:

> In the instant case, the Court concludes that the Trustee willfully violated
> her fiduciary duties in personally authorizing the $10,000.00 refund to the
> Debtors. She acted with total disregard for the statutory requirements for
> the disbursement of estate funds.

(Ct. Ex. 17 at 9.)

At this Court's February 22, 2007, order to show cause hearing, Goldman attempted to

explain this unique "refund" procedure. While Goldman did not testify at the hearing, the

other two Arkansas chapter 13 trustees and two of Goldman's employees did take the

stand.

What emerged was a procedure that apparently had not previously been examined by the

Arkansas bankruptcy courts, a result occasioned by a lack of disclosure to creditors with a

commensurate opportunity for examination and objection.[9] Specifically, chapter 13

debtors benefiting from a tort settlement would typically notice the settlement for court

approval. Generally, the notice would outline the amount, the payment of a fee (generally

---

[9]   A distinction should be made concerning a different refund procedure that came up in
the context of the Morgan AP and in the subsequent show cause hearings before both
Judge Mixon and this Court. This other procedure (referenced in note 8) involves debtors
who encounter some type of dire post-confirmation problem. The best example would be
unexpected and necessary car repair. The debtor would call the chapter 13 trustee's office
and ask for a refund from his or her latest plan payment, usually already in the trustee's
hands from a wage assignment. These amounts were generally small, in the $100.00 to
$300.00 range. The trustee would refund the money to the debtor to resolve the
immediate financial need, but with the understanding that the amount would remain part
of the plan distribution base and would have to be repaid prior to completion of the case.
The second refund procedure exposed in the Morgan Case did not contemplate
repayment, and the amount, once agreed to, never became a part of the plan base. (Tr.
Hrg. Ct.'s Or. to Show Cause at 46-50 (Feb. 22, 2007).)

27

contingent) to the debtor's tort lawyer, and miscellaneous medical fees, with the balance to go to the chapter 13 trustee.  In either or both the notice and the subsequent court order approving the settlement, there would be a reference to the debtor having the right to request or apply for a refund.

When the Morgans settled their tort claim, the application provided as follows:

> Funds to be remitted to the Chapter 13 Trustee to be distributed pursuant to the debtors' confirmed plan, with the exception that debtors will be allowed to request a refund in a sum sufficient to replace the roof on their home and repair debtors' vehicle.

(Tr. Hrg. Ct.'s Or. to Show Cause at 16-17 (Feb. 22, 2007).)

The subsequent order approving the settlement of the Morgans' tort claim stated:

> Said funds shall be paid to the Chapter 13 Trustee, Jo-Ann Goldman, and debtors may apply for a refund from said funds.

(Tr. Hrg. Ct.'s Or. to Show Cause at 17:22-25 (Feb. 22, 2007).)

Implicit from the above language is that the subsequent request or application would be a filed pleading subject to creditor scrutiny and, if appropriate, objection followed by a hearing.  In actuality, no pleading is ever filed.  The request or application is made by the debtor personally or the debtor's attorney (or, as in the Morgans' case, both), over the phone or through email.  The trustee's office administratively handles the process with, generally, the individual trustee granting final approval.

There is no notice to creditors or the court.  Creditors have no idea if the "refund" is $10.00 or $10,000.00; in the absence of a formal filed pleading applying for a refund, creditors have no reason to think that a refund is being requested and, accordingly, do not react; also, lacking notice, the creditors are not afforded an opportunity to examine or question the purpose of the refund.[10]  There are no amendments to the debtors' Schedules

---

[10]  In this instance, although the tort settlement motion referenced roof and vehicle repairs, no specific amounts were stated.  Further, the chapter 13 trustee's office increased

I or J concerning income or expenses.  Further, the trustees' offices apparently do not examine the tort proceeds in the context of personal property or property of the estate, even though most debtors schedule their unliquidated tort claims as personal property on Schedule B.  The debtors do not amend their Schedule Bs to reflect the newly liquidated amount of personal property, or their Schedule Cs to claim these "refund" amounts as exempt.  In the absence of notice or amendments to the schedules, creditors simply are uninformed and unable to examine or object to the refund.

The propriety of this refund procedure is not before this Court except to the extent Goldman offers the practice and procedure as an excuse for her actions in the Morgan Case.  This argument is unpersuasive.  That other Arkansas chapter 13 trustees may use a similar procedure does not cure its fatal flaws.  Judge Mixon is correct.  This is a private agreement, insufficiently documented, involving sums that are either, or possibly neither, property of the estate or subject to a disposable income analysis; it occurs without notice to creditors or court approval.  Creditors never get the chance to review the proposed disposition of the proceeds and, if appropriate, formulate an objection or response.  Again, this practice is not the subject of this opinion; only Judge Mixon's findings of wilful breach of fiduciary duty in the unique circumstances of the Morgan Case are relevant to this Court's decision.

## VII.  Third Basis for Removal

At the initial May 10, 2006, hearing, in his opening statement, Goldman's attorney specifically asserted that Goldman had properly distributed the $20,000.00 amount to the unsecured creditors pursuant to the terms of the Morgans' confirmed plan.  He stated:

------------------------------

the amount based on an informal phone conference with Mr. Morgan.  Mr. Morgan advised that he needed additional funds to cover utilities.  The chapter 13 trustee's office rounded the request up to $10,000.00.  (Tr. Hrg. Ct.'s Or. to Show Cause at 109-10 (Feb. 22, 2007).)  The Morgans used the funds for gambling, trips, credit card bills, and even one of their regularly scheduled plan payments.

29

> Now, Ms. Goldman followed that procedure for a while but she's changed
> that procedure. She believes that these funds are earmarked solely for the
> use of the unsecured creditors, that the secured creditors are bound by the
> terms of a confirmed plan proposing that monthly payment over that plan
> length, and that's the payment that they're entitled to, not the disposable
> income that the debtor receives.

He concluded:

> That's why in this case the monies were paid out to the unsecured
> creditors. And we believe that it was rightfully paid out to the unsecured
> creditors.

(Ct. Ex. 3 at 10-12.)[11]

However, it emerged (slowly and reluctantly) during the May 10 hearing that, conversely, Goldman had made an agreement with the Morgans to pay the secured creditor those funds; her office simply failed to do so because she neglected to document the file with the proper instructions. Despite this admission, and those of her counsel at the July 5 hearing, she later changed her testimony on this key point. She did so after Judge Mixon ruled: she reverted to her original position that the distribution to the unsecured creditors was proper. (Ct. Ex. 9 at 26-28.) In doing so, she uttered false testimony.

Thus is illuminated the crux of this matter and the third basis for Goldman's removal. Goldman's conduct in this case is sufficient cause warranting her removal. Cause is best exemplified by her false testimony, but its clarity in no way diminishes the seriousness of her subtle and less tractable pattern of elevating her personal self-interests above her duties as trustee. Goldman engaged in a course of conduct designed to best protect herself from the consequences of an ill-advised agreement she made in her capacity as a chapter 13 trustee.

---

[11] This was not the last occasion where Goldman put her counsel in an untenable position. Each of her attorneys did an excellent job representing her; only Goldman, an attorney, knew exactly what she had agreed to and the mistakes that had been made.

Goldman immediately breached the agreement by making a distribution contrary to her understanding with the Morgans. However, rather than honestly confronting that reality, she proceeded in a manner designed to protect herself personally from any adverse consequences. In doing so, she compromised her willingness and ability to act responsibly as a chapter 13 trustee.

This, of course, is again demonstrated by her willingness to engage in false testimony. Also, this is exemplified by the occasion when the Morgans filed a modification to provide for no payments to unsecured creditors past the first 36 months; Goldman not only failed to object, she told Judge Mixon that she should have objected. However, the sole basis for her objection would have necessitated an admission that she had made an agreement she had already breached, the consequences of which she was apparently unwilling to accept. Her failure to object exposed the unsecured creditors to possible disgorgement in the Morgan AP, based on her agreement contrary to the confirmed plan, with no recourse to continued plan payments. Goldman put her interests above those of the unsecured creditors, whose rights she had already compromised.

Additionally, once Judge Mixon began examining both the agreement and the use of the $10,000.00 refund, Goldman negotiated a settlement with the Morgans that again compromised the unsecured creditors. The proposed agreement, rejected by Judge Mixon at the July 5, 2006, hearing, represented her complete capitulation. The settlement contemplated that the unsecured creditors would have to disgorge their pro rata distributions back to Goldman, who in turn would distribute the aggregate to the principal secured creditor. Judge Mixon asked Goldman's counsel, "Do you have any authority that you could cite to me that would authorize this settlement?" Goldman's counsel answered, "No, Your Honor, I do not." (Ct. Ex. 6 at 11:4-7.) Goldman attempted to settle the Complaint not on the basis of the original confirmed plan (which called for those funds to be distributed to the unsecured creditors) or the best interests of the unsecured creditors, but solely on the basis of protecting herself. She would have had the

unsecured creditors disgorge the money they properly received under the confirmed plan, so she could redirect the funds to the secured creditor consistent with her agreement, thus curing her breach at their expense.  (Ct. Ex. 6, at 4-8.)

## VIII.  Conclusion

False testimony, Judge Mixon's findings of wilful breach of fiduciary duty, and self preservation at the expense of her duties as a chapter 13 trustee each form an independent basis for removal.  Each reflects adversely on her capacity to act as trustee in any case before the bankruptcy courts in this State and her assigned jurisdiction.  Accordingly, and for cause pursuant to 11 U.S.C. § 324, Goldman is hereby removed as trustee from this case and all other cases under this title in which she is now serving.

IT IS SO ORDERED.

March 15, 2007
_____
DATE

_____
RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc:   Isaac A. Scott, Jr.
      Kent Pray
      Charles Tucker
      Hon. Audrey R. Evans
      Hon. James G.  Mixon

32