# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 07-3782

_____

| | |
|---|---|
| In re: Linda Morgan; <br> James Morgan, <br><br>       Debtors. <br> ———————————————— <br><br> James Morgan; Linda Morgan, <br><br>       v. <br><br> Jo-Ann L. Goldman, <br><br>       Appellant, <br><br> Bank of America; Capitol One Bank; <br> AR Specialty Care Centers; <br> eCAST Settlement Corporation; <br> DeWitt Bank & Trust Company; <br> DeWitt City Hospital; Discover Bank; <br> St. Vincent's Health System; and <br> Kyle Havner. <br> ———————————————— <br><br> National Association of <br> Chapter 13 Trustees, <br><br>       Amicus on Behalf <br>       of Appellant. | Appeal from the United States <br> Bankruptcy Appellate Panel <br> for the Eighth Circuit. |

_____

Submitted: December 12, 2008
Filed: July 28, 2009

_____

Before MELLOY and BENTON, Circuit Judges, and MAGNUSON,[1] District Judge.

_____

MELLOY, Circuit Judge.

Jo-Ann Goldman, a Chapter 13 bankruptcy trustee, appeals a Bankruptcy Appellate Panel ("BAP") decision that affirmed a bankruptcy court[2] order removing her as trustee from all cases assigned to her in the Eastern and Western Districts of Arkansas. We affirm.

## I.

Goldman was appointed trustee for James and Linda Morgan, who filed a voluntary Chapter 13 bankruptcy petition on March 3, 2003. On July 30, 2003, the bankruptcy court confirmed a plan for the Morgans providing that: (1) the Morgans would pay $775 per month for 58 months to Goldman, the trustee; (2) the Morgans' residential-mortgage lender, DeWitt Bank & Trust, would be paid the full value of its secured claim, $32,500 with interest; (3) the remaining unsecured creditors would "receive a pro-rata dividend from funds remaining after payment of administrative, secured, priority, child support, and special nonpriority unsecured claims"; and (4) the

---

[1] The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota, sitting by designation.

[2] The Honorable James G. Mixon, United States Bankruptcy Judge for the Eastern District of Arkansas.

-2-

Morgans would "submit all projected disposable income for the benefit of unsecured creditors during the first 36 months of the plan."

On March 29, 2005, the Morgans moved for the bankruptcy court's approval to settle a tort claim that they had listed in their schedules as an unliquidated claim with an unknown value. According to their motion, the Morgans intended to submit their proceeds from the proposed settlement, which amounted to approximately $30,000, to Goldman "to be distributed pursuant to [their] confirmed plan with the exception that [they would] be allowed to request a refund in a sum sufficient to replace the roof on their home and repair [their] vehicle."

After the Morgans submitted their motion but before the court ruled, Goldman and one of the Morgans' lawyers, Jeremy Bueker, further discussed the disbursement of the Morgans' proposed settlement proceeds. In a series of emails, Bueker told Goldman that, rather than paying the proposed settlement proceeds to unsecured creditors, the Morgans wanted Goldman to use the proceeds to pay off their secured mortgage with DeWitt Bank & Trust. Goldman responded that the proceeds were "disposable income" earned within thirty-six months of the plan's confirmation and that, under the terms of the confirmed plan, the proceeds had to be paid to unsecured creditors. Goldman stated, however, that she could pay the secured mortgage if the Morgans' increased their base payments and the settlement proceeds came to her office without specific instructions from the bankruptcy court. Bueker, who was drafting a proposed settlement-approval order for the bankruptcy court, replied to Goldman:

> If I state [in the proposed order] that the money comes to your office period, will you first pay off secured and then priority claims before money is disbursed to unsecured creditors? If not, I think the [Morgans] are better off dismissing or converting to Chapter 7. I advised them to proceed this way so that their house would be paid off.

-3-

Goldman responded, "I will pay it out but add whatever the amount is to the base, so the unsecured creditors are being paid with monthly payments." Bueker then sent Goldman a proposed court order authorizing the Morgans' tort settlement, which he subsequently submitted to the bankruptcy court. The order simply instructed the Morgans to pay their settlement proceeds to Goldman and provided that the Morgans could "apply for a refund from said funds." The court entered the order without objection.

In May 2005, Goldman received the Morgans' settlement proceeds. The Morgans requested approximately $9,000 of the proceeds to repair their home and car, and Goldman refunded the Morgans approximately $10,000 for those purposes. Goldman later testified that she had intended to place a notation in the Morgans' file instructing her employees not to disburse the remaining $20,000 to unsecured creditors, but she failed to make such a notation. Thus, Goldman's office distributed the Morgans' remaining settlement proceeds to the Morgans' unsecured creditors instead of paying the Morgans' secured mortgage with DeWitt Bank & Trust.

On August 30, 2005, the Morgans sued Goldman and their unsecured creditors to recover the disbursed settlement proceeds. The Morgans argued that turnover of the proceeds was necessary because the confirmed plan required Goldman to pay their secured creditors first and, alternatively, because Goldman had agreed with Bueker to use the proceeds to pay off their secured mortgage. Goldman responded that the distribution of the proceeds to the unsecured creditors had been appropriate because the proceeds were disposable income earned within thirty-six months of the bankruptcy court's confirmation of the Morgans' bankruptcy plan.

On May 10, 2006, the bankruptcy court held a hearing regarding the Morgans' claim. As relevant to this matter, one of the Morgans' attorneys cross-examined Goldman concerning her agreement with Bueker. They had the following exchange:

-4-

Q:  The conversation that you talked about with Mr. Bueker, this was after the order had been entered of record and the funds disbursed?

A:  Oh, no.  We had telephone conversations during the course of the e-mail correspondence.  Our total conversations were not limited to e-mail.

Q:  Okay.  But you agree that the e-mail is very clear as —

A:  Yes.

Q:  — that you would disburse the money to the secureds first?

A:  Yes.

. . . .

Q:  But your e-mail with Mr. Bueker was that you would pay [the settlement proceeds] to secured [sic]?

A:  As a professional courtesy, and with the meeting of the minds that the debtor intended on staying in 58 months, I was willing to grant his request.

Q:  Okay.  But then it didn't happen?

A:  Unfortunately, I didn't docket that in the docket.

Q:  Okay.

A:  And my staff, it disbursed as it normally would pursuant to office procedure.

The bankruptcy court also questioned Goldman regarding her disputed agreement with Bueker and, in response to the court's questions, Goldman gave the following testimony:

-5-

THE COURT: Okay. So what happened here is you agreed to, with Mr. Bueker, if he would give you the money you would disburse it to the secured creditor and then you didn't make that proper note or something in the docket, and the money went out contrary to your agreement?

THE WITNESS: Well, realize though this wasn't to get the money.

THE COURT: Okay. I understand.

THE WITNESS: I knew I was going to get the money.

THE COURT: That's right.

THE WITNESS: So it was just under the terms we don't want that to be a restrictive order telling the Trustee how to disburse, so we always request that it come in and it be disbursed pursuant to the confirmed plan.

And had these e-mails not been exchanged or I had docketed it correctly I was—that would have been a professional courtesy to do that for him because the net result would have been the same, would have been the only reason why. I rarely ever by e-mail agree to do that.

THE COURT: And the answer to my question is, "Yes," then that's what happened?

THE WITNESS: Yes. Yes, that's what happened.

THE COURT: All right. Okay. And then you agreed to that under the assumption that he would continue to pay the plan over the balance of the 58 months?

THE WITNESS: That's right.

THE COURT: Was that ever expressly agreed to between you and Mr. Bueker—

-6-

THE WITNESS:  Well—

THE COURT:  —as a quid pro quo that you would agree to do this if he would stay for 58 months?

THE WITNESS:  We were having a banter back and forth, and in particular I remember a telephone conversation where I said, "Why does it matter if the unsecured"—

THE COURT:  No, no.  Listen to my question.  Was that specifically agreed to that you would pay the secured claims with that money if he would stay in for 58 months?

THE WITNESS:  No.

THE COURT:  There was no specific?

THE WITNESS:  No.

THE COURT:  It was just discussed?

THE WITNESS:  No. It was just discussed.

THE COURT:  Okay. And you sort of assumed that he would do that.

THE WITNESS:  I sort of assumed and hoped that he would—

THE COURT:  Okay.

At the conclusion of the hearing, the bankruptcy court stated that "it may be that there will have to be some action on the Trustee's bond because [Goldman] admit[ted] to agreeing to [pay the secured creditor], and it was just some sort of administrative error that resulted in [the payment] not happening."  Goldman did not object to the court's finding, and the court took the matter under advisement.

-7-

Following the May 2006 hearing, the parties met and proposed a settlement whereby Goldman agreed to recover sufficient payments from the unsecured creditors to pay the remaining principal of the Morgans' mortgage. On July 5, 2006, the bankruptcy court held a hearing to discuss the parties' proposed settlement. Goldman did not testify at the hearing, but her attorney discussed with the court the payout of the Morgans' settlement proceeds and recognized on the record that Goldman had made an agreement with Bueker. In particular, Goldman's attorney stated that Goldman's "policy was to disburse [funds] the way she wanted to, but out of a professional courtesy to [Bueker's] office she did agree to a different disbursement, against probably her better judgment, and presupposed some other conditions that now have not happened." Additionally, the court stated:

> And I believe [Goldman's previous] testimony was that in her opinion she disbursed—it was disbursed correctly, even though contrary to the agreement that you had, but that she and Mr. Bueker had cut an agreement where she was going to disburse it the way he wanted to because she had reasons that if you paid out—if the plan paid out the total number of months that it was proposing to do, that it would be as broad as it was long, and that everybody would get the same amount of money.

The court also observed that Goldman had "acknowledged that she made the agreement and that it was an inadvertent error that [the settlement proceeds] got paid to the unsecureds." Goldman's attorney did not contest these statements.

At the conclusion of the July 2006 hearing, the bankruptcy court rejected the parties' proposed settlement because the court concluded that it had no authority to require the unsecured creditors to turn over the disbursed proceeds. Additionally, the court again acknowledged on the record that Goldman had made an agreement with Bueker and that Goldman had not distributed the Morgans' settlement proceeds in accordance with that agreement. Nonetheless, the court stated that the Morgans' off-the-record request to have Goldman pay their mortgage in lieu of paying the

-8-

unsecured creditors was in violation of their confirmed plan. Therefore, the court found that the Morgans were estopped from recovering damages for Goldman's "failure to fulfill her promise," and it dismissed the Morgans' claim.

On October 13, 2006, the Morgans moved to amend the bankruptcy court's judgment or, alternatively, for a new trial. On November 7, 2006, the bankruptcy court held a hearing on the Morgans' motion. During the hearing, Goldman testified again about her conversations with Bueker and denied that she had ever reached an agreement with him regarding the payout of the Morgans' settlement proceeds. In particular, the court and Goldman had the following exchange:

> THE COURT: Okay. But now, do I understand your testimony to be that you deny that you had an—that you made an agreement with Mr. Bueker that you would distribute that 20,000 to the secured claim at the Bank of DeWitt?

> THE WITNESS: That's correct.

> THE COURT: Did you—

> THE WITNESS: I have e-mail and phone conversations with attorneys everyday about how the plans are interpreted. And without a modification of the plan, I would disburse the money as the plan is interpreted.

> THE COURT: You don't recall those e-mails where you—where they purport to show that you agreed to do that?

> THE WITNESS: Yes, I recall the e-mails. I had numerous phone conversations with him and numerous e-mails about how the money would be disbursed. And I explained to Mr. Bueker on numerous occasions, and I testified to this in the original hearing, and that was that that's not the way I read the plan, that's not the way my office regularly disburses the money.

-9-

> I suppose that if what he's saying is true, it could be interpreted that way. But if he was arguing to me, it wouldn't make a difference because the unsecured creditors would get the benefit of the money.
>
> The end result of my last conversation was: "Then why do you care? What's the difference?"
>
> But none of that—I do not send e-mails and modify plans by virtue of e-mails. I can't do that. I have no power to do that.
>
> The only thing I can modify a plan, is a modification of the plan.
>
> THE COURT: So you deny his allegation that you agreed to pay the 20,000?
>
> THE WITNESS: Yes.
>
> THE COURT: With him?
>
> THE WITNESS: Yes.
>
> THE COURT: Okay.

At the hearing's conclusion, the court characterized Goldman's testimony as "new" and took the Morgans' motion under advisement.

On November 20, 2006, the bankruptcy court filed an order denying the Morgans' motion to amend its judgment or, alternatively, for a new trial. The court also issued a sua sponte order directing Goldman to show cause why it should not remove her as the Morgans' trustee "for cause" for giving "false testimony under oath."[3] The court specifically stated that, in the November 2006 hearing, Goldman

---

[3] The court also stated that "[f]urther cause exist[ed] to remove Ms. Goldman as Trustee because she ha[d] a conflict of interest." Specifically, the court stated that Goldman was "a named defendant in her individual capacity" in the Morgans'

had "testified that she had no agreement with [Bueker] . . . when, in truth and fact, she had made such an agreement." As support for that conclusion, the court cited Goldman's prior testimony, the emails between Goldman and Bueker, and the Morgans' and Bueker's testimony. On December 15, 2006, the court further directed Goldman "to show cause why she should not be removed as Trustee in all cases assigned to her[,] . . . . suspended from practice before the United States Bankruptcy Court . . . [,] or referred to the Arkansas Supreme Court Committee on Professional Conduct" for giving false testimony. This second order was consistent with a November 21, 2006 order in a separate case, In re Dedmon, where a different bankruptcy court in the Eastern District of Arkansas had ordered Goldman to show cause why she should not be removed for cause as trustee in that case and all other cases and "sanctioned, suspended, or disbarred from practice" for her conduct in the Morgans' case.

Both the Morgan and Dedmon courts subsequently held hearings regarding Goldman's potential removal. Goldman testified at both proceedings and denied that she had ever reached an agreement with Bueker regarding the disbursement of the Morgans' settlement proceeds. On March 15, 2007, the Dedmon court issued an order removing Goldman from all of her cases in which she was serving as trustee. See In re Dedmon, 366 B.R. 1, 3 (Bankr. E.D. Ark. 2007), rev'd, In re Morgan, 375 B.R. 838, 842 (B.A.P. 8th Cir. 2007). On April 3, 2007, the Morgan court filed a similar order in which it concurred with the Dedmon court's findings and removed Goldman as trustee from all cases assigned to her in the Eastern and Western Districts of Arkansas for giving "misleading and false testimony under oath at the November 7, 2006[] hearing."[4]

_____

turnover case and that her "interests [were] adverse to the interests of the estate over which she [was] Trustee."

[4] Although referenced in the Morgan court's show-cause order, the Morgan court's removal order did not address whether there had been a conflict of interest.

-11-

Goldman appealed both removal orders to the BAP, which consolidated her appeals. The BAP reversed the removal order in <u>Dedmon</u> and affirmed the removal order in <u>Morgan</u>. <u>In re Morgan</u>, 375 B.R. at 842. Goldman now appeals the BAP's affirmance of the <u>Morgan</u> court's removal order.[5] The National Association of Chapter 13 Trustees has filed an amicus curiae brief in her support.

## II.

When reviewing a BAP decision, "[w]e apply the same standard of review as the BAP." <u>In re Racing Servs., Inc.</u>, 540 F.3d 892, 897–98 (8th Cir. 2008). "We review the bankruptcy court's findings of fact for clear error and its legal conclusions <i>de novo</i>." <u>Id.</u>

### A.

Goldman first argues that the <u>Morgan</u> court's order removing her as trustee in all of her pending cases in the Eastern and Western Districts of Arkansas unconstitutionally deprived her of property without due process of law. She argues that she had a property interest in her position as trustee in the cases in which she had already been appointed, and she claims that the <u>Morgan</u> court's order deprived her of that property interest without due process because the court's sua sponte order biased the court and unconstitutionally shifted the burden to her to demonstrate that she had

---

Additionally, the <u>Morgan</u> court chose not to suspend Goldman from practice before the U.S. Bankruptcy Courts in Arkansas or refer her to the Arkansas Supreme Court's Committee on Professional Conduct because it found that removing Goldman as trustee from all of her pending cases in Arkansas was a sufficient sanction.

[5] Goldman was unopposed on her appeal to the BAP, and, likewise, there is no appellee in this appeal. Thus, the BAP's reversal of <u>Dedmon</u> is not before us, and we rely on the record and written opinions of the bankruptcy court and BAP as support for their respective positions.

given truthful testimony. She also asserts that the Due Process Clause required the court to utilize additional proceedings or parties to resolve the matter. We review her due process claims de novo. See Coal. for Fair and Equitable Regulation of Docks on Lake of the Ozarks v. Fed. Energy Regulatory Comm'n, 297 F.3d 771, 778 (8th Cir. 2002) ("[W]e review de novo constitutional questions, such as . . . due process claims.").

"The Due Process Clause of the Fifth Amendment prohibits the United States . . . from depriving any person of property without 'due process of law.'" Dusenbery v. United States, 534 U.S. 161, 167 (2002). For plaintiffs to establish unconstitutional deprivations of property under the Fifth Amendment, they must show that they (1) have protected property interests at stake and (2) were deprived of such property interests without due process of law. Gordon v. Hansen, 168 F.3d 1109, 1114 (8th Cir. 1999). Assuming without deciding that Goldman had a property interest in her trustee position in the cases in which she had already been appointed, we reject her claim that the Morgan court deprived her of such property without due process.

"Due process is a flexible concept, and its procedural protections will vary depending on the particular deprivation involved." Johnson v. Outboard Marine Corp., 172 F.3d 531, 537 (8th Cir. 1999). "In general, due process requires that a hearing before an impartial decisionmaker be provided at a meaningful time, and in a meaningful manner." Id. (quotation omitted); see Caperton v. A.T. Massey Coal Co., 129 S. Ct. 2252, 2259 (2009) ("It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process.'" (internal quotation and alteration omitted)).

When analyzing a judicial-bias claim under the Due Process Clause, we start with "a presumption of honesty and integrity in those serving as adjudicators." Withrow v. Larkin, 421 U.S. 35, 47 (1975); see Gordon, 168 F.3d at 1114 ("Although the Due Process Clause requires a fair and impartial tribunal, we begin with a presumption that decision-makers are honest and impartial." (internal quotation and

-13-

alteration omitted)); see also Caperton, 129 S. Ct. at 2267 (Roberts, C.J., dissenting) ("All judges take an oath to uphold the Constitution and apply the law impartially, and we trust that they will live up to this promise."). In the absence of a finding of actual bias, our inquiry is objective. Caperton, 129 S. Ct. at 2263. We ask "not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" Id. at 2262.

Based on the record, we reject Goldman's judicial-bias claims. There is nothing in the record to support a claim of actual bias, and we do not believe that the Morgan court's sua sponte action objectively "created a constitutionally intolerable probability of actual bias." Id. at 2262. The undisputed facts show that the Morgan court viewed evidence and heard testimony first hand that led it to determine independently that Goldman had made false statements under oath. See Caperton, 129 S. Ct. at 2261–62 (discussing the Court's decision in In re Murchison, 349 U.S. 133 (1955) and recognizing that "'adjudication by a trial judge of a contempt committed in [a judge's] presence in open court cannot be likened to the [unconstitutional] proceedings [in Murchison]'" (quoting Murchison, 349 U.S. at 137)). Moreover, while the court did ask Goldman and other parties questions related to the existence of the disputed agreement, we reject Goldman's contention that such questioning actually or objectively rendered the court a biased accuser, advocate, or prosecutor. Instead, the record reflects that the court's questioning was rooted in its role as a fact finder attempting to resolve the conflict before it. That the court found factual inconsistencies in Goldman's testimony and attempted to clarify her statements does not make it an accuser or a prosecutor, and there is nothing in the record that leads us to believe that the Morgan court's proceedings created an unconstitutional potential for bias. For those reasons, we are unconvinced "under a realistic appraisal of psychological tendencies and human weakness" that the Morgan court's sua sponte action "pose[d] such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." Id. at

-14-

2263 (quotation omitted). Moreover, we do not believe that this case presents "circumstances in which experience teaches that the probability of actual bias on the part of the judge or decision-maker is too high to be constitutionally tolerable." Id. at 2259 (internal quotation omitted).

Furthermore, the record demonstrates that Goldman received substantial, fair process before the Morgan court removed her as trustee in her pending cases. The Morgan court's decision to remove Goldman stemmed from evidence involving four different hearings, and the parties were on notice throughout that the alleged agreement between Goldman and Bueker was a significant issue in resolving their dispute. In those four hearings, Goldman testified before the Morgan court three times on the subject of the disputed agreement, and the court on several occasions stated on the record its finding that the Morgans had proved that the alleged agreement existed. Nonetheless, it was not until November 2006—approximately six months after the court first announced its finding that Goldman had agreed to pay the Morgans' mortgage—that Goldman refuted the court's conclusion, which the court had previously relied upon when dismissing the Morgans' original claim against Goldman. At that point, the court gave Goldman notice of its finding that she had given inconsistent testimony and held a hearing to allow Goldman an opportunity to explain her statements and present evidence. Contrary to Goldman's claim, by doing so, the Morgan court did not place an unconstitutional burden on Goldman to prove that her prior testimony had been accurate. Rather, because the Morgans had already proven the existence of the disputed agreement, the court's hearing merely allowed Goldman an opportunity to clarify her testimony.

Finally, we reject Goldman's contention that the Due Process Clause requires a bankruptcy court to utilize different procedures or additional parties, such as the U.S. Trustee or the state bar, to resolve matters such as the one before us. In Mathews v. Eldridge, 424 U.S. 319, 335 (1976), the Supreme Court instructed courts to apply a flexible, three-part balancing test to determine whether procedural due process is

-15-

satisfied in a given case.  That test considers: "(1) the private interest that will be affected by the governmental action, (2) the risk of an erroneous deprivation of such interest through the procedures used, along with the probable value, if any, of requiring additional or substitute procedures, and (3) the governmental interest involved, including the burdens that the additional or substitute procedures would create."  Walters v. Weiss, 392 F.3d 306, 314 (8th Cir. 2004).  Considering these factors, we do not believe that the Due Process Clause entitled Goldman to alternative procedures or additional party involvement in this case.  Though we agree that Goldman's interest in her position is significant, the Morgan court relied upon a developed, undisputed record to reach its decision, and Goldman had more than ample opportunity to call witnesses and present evidence before the court.  For these reasons, we reject each of Goldman's due process arguments.[6]

## B.

Even if the Morgan court's order did not violate the Due Process Clause, Goldman claims that it was unlawful pursuant to stricter tenets of bankruptcy law.  We review interpretations of the Bankruptcy Code de novo.  Velde v. Kirsch, 543 F.3d 469, 472 (8th Cir. 2008).

Goldman contends that the Morgan court's sua sponte removal order was inconsistent with 11 U.S.C. § 324, which provides:

---

[6] Our conclusion should not be read to indicate, however, that it would not be valuable, and arguably preferable, to ask a third party to prosecute a removal proceeding.  In particular, the U.S. Trustee, as the supervising agency for panel trustees, could play a useful role in investigating and prosecuting a claim such as this.  In addition, we note that the task of reviewing courts such as the BAP and the court of appeals is made more difficult when there is no appellee to defend the bankruptcy court's decision.

(a) The court, after notice and a hearing, may remove a trustee, other than the United States trustee, or an examiner, for cause.

(b) Whenever the court removes a trustee or examiner under subsection (a) in a case under this title, such trustee or examiner shall thereby be removed in all other cases under this title in which such trustee or examiner is then serving unless the court orders otherwise.

She claims that § 324 and the Bankruptcy Code itself do not authorize sua sponte removals of private trustees and that, because the party seeking removal pursuant to § 324 has the burden to prove cause for removal, see In re Alexander, 289 B.R. 711, 714 (B.A.P. 8th Cir. 2003), a bankruptcy court cannot legally be both the party seeking removal and the party adjudicating the matter. Goldman also argues that removal under § 324 requires actual harm to the bankruptcy estate or its creditors and that no such harm was present here.

Goldman's arguments fail to recognize that the Morgan court not only acted pursuant to § 324 of the Bankruptcy Code, but it also acted pursuant to 11 U.S.C. § 105(a). Section 105(a) states:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

Contrary to Goldman's contention then, section 105(a) expressly provides bankruptcy courts with authority to take sua sponte action to remove private trustees,

-17-

and it places no requirement of actual harm to the estate or its creditors when doing so. Instead, § 105(a) allows courts to take such actions when "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]" or when "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

Here, the Morgan court's removal order emphasized that Goldman's testimony lacked the candor that local and state rules require when trustees such as Goldman testify, and Goldman does not dispute the existence or validity of those rules. Moreover, besides attacking the Morgan court's factual findings, Goldman makes no argument that the Morgan court's removal order was unnecessary or inappropriate to implement or enforce those rules or the provisions of the Bankruptcy Code, or "to prevent an abuse of process." Id. Thus, pursuant to § 105(a), we reject Goldman's claim that the Morgan court's sua sponte order was unlawful.

## C.

Goldman's third contention is that the Morgan court's removal order is void because it relied on the Dedmon court's decision, which the BAP subsequently reversed. This argument is factually unavailing.

While the Morgan court's removal order referenced and concurred with the Dedmon court's order, a review of the Morgan court's order reveals that the Morgan court made independent findings sufficient to justify its action. The Morgan court order specifically explained the court's finding that Goldman had given false testimony under oath, stated that the court "has to have complete confidence in a Chapter 13 trustee's testimony to effectively administer cases filed under Chapter 13," and, citing legal authority, stated that "Goldman's testimony at the November hearing lacked the candor required by [the court]."

-18-

Moreover, contrary to Goldman's contention, the BAP's reversal of the Dedmon court did nothing to undermine the Morgan court's conclusions. The BAP reversed the Dedmon court for failing to give Goldman proper notice, specifically finding that the Dedmon court's show-cause order failed to "specify which of the Morgan judge's findings and conclusions formed the basis for removal and sanctions." In re Morgan, 375 B.R. at 849–50. The BAP, however, ruled that the Morgan court had given Goldman appropriate notice, id. at 850–51, and the BAP affirmed the Morgan court's removal decision for the reasons contained in the Morgan court's order, see id. at 851–55. Thus, we reject Goldman's claim that the BAP's reversal of the Dedmon court undermined the Morgan court's order or rendered it a nullity.

## D.

Goldman's final arguments relevant to this appeal[7] are that she did not give false testimony, that the court failed to properly evaluate her testimony under a perjury standard, and that any agreement with Bueker was not legally binding.

As already stated, "[w]e review the bankruptcy court's findings of fact for clear error and its legal conclusions de novo." In re Racing Servs., Inc., 540 F.3d at 897–98. Based on Goldman's testimony recounted above, we cannot say that the Morgan court clearly erred in reaching its factual conclusion that Goldman gave false testimony under oath. At the very least, Goldman's testimony was inconsistent, and she made no effort to clarify her initial testimony despite the Morgan court's repeated statements that it interpreted her testimony and the evidence to mean that she and Bueker had reached an agreement that Goldman would use the Morgans' settlement

---

[7] Goldman's brief makes additional arguments related to whether she had a conflict of interest. The Morgan court's removal order, however, did not reference Goldman's potential conflict of interest. Thus, the issue is irrelevant. Moreover, even if the issue were relevant, our affirmance of Goldman's removal on the grounds related to her testimony renders any conflict-of-interest issue moot.

proceeds to pay off the Morgans' secured mortgage with DeWitt Bank & Trust. Thus, there is more than adequate evidence on the record to support the <u>Morgan</u> court's findings regarding the veracity of Goldman's testimony.

Additionally, we reject Goldman's invitation to apply a perjury standard in this case. The Bankruptcy Code contains no requirement that bankruptcy courts apply a perjury standard when evaluating testimony for truthfulness. Rather, the Code only requires courts to make sufficient factual findings to support removal under § 105(a) or § 324. <u>See</u> 11 U.S.C. §§ 105(a), 324; <u>see also</u> <u>In re Walker</u>, 515 F.3d 1204, 1212–13 (11th Cir. 2008) (affirming the removal of a bankruptcy trustee for giving contradictory and false testimony and rejecting the perjury standard as "irrelevant" to the proceedings because the trustee was not charged with or convicted of criminal perjury). As explained above, the court made such findings here.

Finally, whether Bueker and Goldman entered into an agreement that was legally binding is irrelevant for purposes of this appeal. The issue in this case is not whether there was an agreement that was actually binding, it is whether Goldman gave false testimony. As stated above, we cannot say that the bankruptcy court clearly erred in finding that she did. Therefore, we reject Goldman's remaining claims.

III.

We note that the sanction in this case, removal as trustee in all of Goldman's pending cases in the Eastern and Western Districts of Arkansas, is severe. That result, however, is dictated by § 324(b) when a trustee is removed in any one case, and we can find nothing in the record, nor any argument on appeal, that Goldman requested the <u>Morgan</u> court to exercise its discretion and not remove her in all pending cases. Goldman and amicus also do not contest the <u>Morgan</u> court's or the BAP's finding that giving false testimony in a bankruptcy proceeding constitutes cause for removal of a trustee under § 105(a) or § 324(a). Having determined that the bankruptcy court's action was permissible and that the record supported its findings, we therefore affirm the BAP's decision.

_____